**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **WANDA RODRIGUEZ,** | : | **Civil No. 1:20-cv-02440** |
| | : | |
| **Plaintiff** | : | **(Magistrate Judge Carlson)** |
| | : | |
| **v.** | : | |
| | : | |
| **KILOLO KIJAKAZI,** | : | |
| **Acting Commissioner of Social Security[1],** | : | |
| | : | |
| **Defendant** | : | |

**MEMORANDUM OPINION**

## I. Introduction

The Supreme Court has underscored for us the limited scope of our substantive review when considering Social Security appeals, noting that:

> The phrase "substantial evidence" is a "term of art" used throughout administrative law to describe how courts are to review agency factfinding. T-Mobile South, LLC v. Roswell, 574 U.S. ——, ——, 135 S. Ct. 808, 815, 190 L.Ed.2d 679 (2015). Under the substantial-evidence standard, a court looks to an existing administrative record and asks whether it contains "sufficien[t] evidence" to support the agency's factual determinations. Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229, 59 S. Ct. 206, 83 L.Ed. 126 (1938) (emphasis deleted). And whatever the meaning of "substantial" in other contexts, the threshold for such evidentiary sufficiency is not high. Substantial evidence, this Court has said, is "more than a mere scintilla." Ibid.; see, e.g., Perales, 402 U.S. at 401, 91 S. Ct. 1420 (internal quotation marks omitted). It means—and means only—"such relevant evidence as a

[1] Kilolo Kijakazi became the Acting Commissioner of Social Security on July 9, 2021. Accordingly, pursuant to Rule 25(d) of the Federal Rules of Civil Procedure and 42 U.S.C. § 405(g) Kilolo Kijakazi is substituted for Andrew Saul as the defendant in this suit.

> reasonable mind might accept as adequate to support a conclusion." Consolidated Edison, 305 U.S. at 229, 59 S. Ct. 206. See Dickinson v. Zurko, 527 U.S. 150, 153, 119 S. Ct. 1816, 144 L.Ed.2d 143 (1999) (comparing the substantial-evidence standard to the deferential clearly-erroneous standard).

Biestek v. Berryhill, 139 S. Ct. 1148, 1154 (2019).

Wanda Rodriguez filed an application for disability and disability insurance benefits, as well as supplemental security income under Titles II and XVI of the Social Security Act on November 30, 2017. A hearing was held before an Administrative Law Judge ("ALJ"), and the ALJ found that Rodriguez was not disabled as of the onset date of disability of September 21, 2017 and denied her application for benefits.

Rodriguez now appeals this decision, arguing that the ALJ's decision is not supported by substantial evidence. However, while we regard this as a close case, after a review of the record, and mindful of the fact that substantial evidence "means only—'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion,'" Biestek, 139 S. Ct. at 1154, we find that substantial evidence supported the ALJ's findings in this case. Therefore, for the reasons set forth below, we will affirm the decision of the Commissioner denying this claim.

## II. Statement of Facts and of the Case

On November 30, 2017, Rodriguez applied for a period of disability and disability insurance benefits and for supplemental security insurance benefits (Tr.

121). Prior to her November 30 application, Rodriguez had applied for benefits, and her applications were denied on September 20, 2017. In her November 30 applications, Rodriguez cited an array of physical and emotional impairments, including anxiety, depression, asthma, carpal tunnel syndrome, arthritis of the neck, high cholesterol, three herniated discs in her back, spinal cord problems, possible fibromyalgia, and tendinitis (Tr. 195, 271). Rodriguez alleged that her disability began on September 21, 2017, when she was 50 years old. (Tr. 121, 270). On the date of the ALJ's decision, Rodriguez had past relevant work experience as a hand packager of chocolates, a wood cutter, and a filler and packer of pillows. (Tr. 128, 217).

With respect to these alleged impairments the clinical record, medical opinions, and the plaintiff's activities of daily living revealed the following. On October 31, 2012, Rodriguez settled a worker's compensation claim (Tr. 426), which was approved by the Pennsylvania Bureau of Workers' Compensation on August 6, 2015.

On March 17, 2016, Philhaven completed a psychiatric evaluation of Rodriguez (Tr. 636-39), in which she was diagnosed with major depressive disorder, single episode, severe; general anxiety disorder; R/O Post Traumatic Stress Disorder; pinched nerves in her neck; status post hysterectomy and cholecystectomy;

and a possible diagnosis of fibromyalgia. (Tr. 638). She was placed on medications and encouraged to continue therapy. (Tr. 638-39).

With respect to her alleged mental impairments, at a November 17, 2017 visit at Philhaven, Rodriguez reported that her mood was not good due to health issues, that she had anxiety, and that she slept well with meds, though only for about four hours. (Tr. 632). It was noted that she had been denied social security benefits, and that she needed a corrected psychiatric evaluation. (Id.) On examination, she Rodriguez had a depressed and anxious mood, a tearful affect, but otherwise normal mental status findings. (Tr. 633). Around this time, Rodriguez's primary care doctor, Dr. Matthew Torres, M.D., noted that her "[m]ajor depressive disorder with single episode [was] in full remission." (Tr. 567). A visit to Wellspan in January of 2018 revealed identical mental status findings on examination. (Tr. 630-31). At this time, Dr. Torres recorded that Rodriguez had a normal mood, affect, and behavior with "no distress." (Tr. 674).

In February, Rodriguez reported that her mood was good, that she had some anxiety but medication helped, that her sleep was not good, and that her appetite was controlled with medication. (Tr. 626). Again, her mental status examination revealed normal findings. (Tr. 627).

On March 2, 2018, Dr. Helen Parshall, Ph.D., performed a medical evaluation to determine "B" and "C" criteria of the listings. (Tr. 284-285). Dr. Parshall found

that Rodriguez had only mild problems with understanding, remember, and applying information; interacting with others, concentrating, persisting, and maintaining pace; and adapting and managing oneself. (Tr. 284). Dr. Parshall opined that Rodriguez's

> Mental allegations are partially consistent with ongoing outpatient individual therapy via Philhaven for effects of fibromyalgia and depression. Progress note and MSE 2/02/2018 report a favorable response to medications; sic, mood improved but still in pain. MSE within normal limits.
>
> Based on current MER, the alleged mental impairments warrant appropriate MH interventions but do not impose more than mild functional/social restrictions. The mental impairment is non-severe.

(Tr. 285).

Another psychiatric evaluation was performed on March 23, 2018, and Rodriguez was diagnosed with major depressive disorder, recurrent, without psychotic features, moderate to severe; generalized anxiety disorder, posttraumatic stress disorder, fibromyalgia, and chronic pain. (Tr. 754). On examination, she was alert and oriented; her mood was depressed an anxious, and she was tearful at times; she had good concentration and attention; her memory was intact, and her thought processes were organized; and she had a normal gait and station. (Id.) In May, it was noted that Rodriguez was struggling with her chronic pain, but her medications had been helpful. (Tr. 757). On August 31, 2018, Rodriguez reported that her mood was "okay" but that she was sometimes depressed and had "a lot" on her mind, that her anxiety was better, and that she slept 4-5 hours per night. (Tr. 642). It was noted that

Rodriguez had not been taking her medications at this time, and her depression and anxiety were worsening. (Tr. 773-74).

Rodriguez began taking her medications consistently, and she showed improvement in September of 2018. (Tr. 776). However, in January of 2019, her depression and anxiety were worsening again, as she was stressed about not being able to pay her bills. (Tr. 779-80). Rodriguez showed some improvement in March of 2019, and it was noted that her medications were helping, and she was taking them regularly. (Tr. 781). In April, treatment notes state that her anxiety was better, and her depression was under control. (Tr. 784). Similar findings were noted in July of 2019. (Tr. 788).

With respect to her alleged physical impairments, on November 8, 2017, Dr. Matthew Torres, M.D., Rodriguez's primary care physician, noted that Rodriguez had generalized body aches and was "off her Neurontin" because "[s]he ran out and did not call[] in for refills, since she felt better. She reported today that this medication did indeed help[] her pain; however, she has not had this medication for over one month." (Tr. 572). On November 24, 2017, Dr. Torres noted that Rodriguez has bilateral carpal tunnel syndrome. (Tr. 567). Dr. Torres noted Rodriguez had "a lot of axial back pain and sensitivity, in addition to widespread muscle pain, fatigue and cloudy thinking." (Tr. 569).

On February 20, 2018, Rodriguez completed an Adult Function Report with assistance. (Tr. 513-20). She described her pain as being a "10" on a scale of one through ten, and stated that her pain in her hands, lower back, arms, shoulders, spinal cord, and "most of the body" has worsened since it began, and it occurs all day every day. (Tr. 521). She stated that she cooks simple meals such as sandwiches "2 or 3 times a week," which takes her ten minutes, and that it was very difficult to hold pots and pans since her condition began. (Tr. 515). She reported that the only chores she does are "light dusting" and wiping the table, and that these take her 30 minutes with breaks in between. (Tr. 515). She stated that she goes outside three times per week, and that she shops once per week, but later in her report stated that she does not go shopping. (Tr. 516-17). Rodriguez reported that her interests were reading, shopping, playing sports, and working, and that she reads daily. (Tr. 517). When asked how her activities changed since the conditions began, she reported that she does not walk for long, cannot play sports, and cannot work. (Id.) Rodriguez stated that she goes to church and spends time with her daughter and grandchildren. (Id.)

On March 1, 2018, Dr. Candelaria Legaspi, M.D., a state agency consultant, assessed Rodriguez's residual function capacity, finding that Rodriguez could occasionally lift and carry 20 pounds, frequently lift and carry 10 pounds, stand and/or walk with normal breaks for a total of "[a]bout 6 hours in an 8-hour workday," sit with normal breaks for a total of "[a]bout 6 hours in an 8-hour workday," push

and pull without limitation, and occasionally balance, kneel, crouch, crawl, and climb ramps, stairs, ladders, ropes, and scaffolds. (Tr. 274-76). In determining the postural limitations, Dr. Legaspi acknowledged arthritis, disc, spinal cord, and tendinitis problems and noted an absence of numbness and tingling sensations. (Tr. 276). Under the heading for Additional Explanation of RFC, Dr. Legaspi explained that Rodriguez's pain was primarily noted to be associated with fibromyalgia, that her examinations largely showed normal range of motion, and overall that the treatments and medications seemed to be going well. (Tr. 275-76).

On April 6, 2018, Dr. Torres noted Rodriguez:

> [H]as been doing well, except she has concerns about numbness in her legs. This has been present previously, but she feels that it is worsening. Every time she sits on the toilet or sits for long periods of time she notices numbness and pain in the legs, from her low back to her toes. After she gets up and moves her legs, the numbness will go away. She feels that her legs are kind of weak, especially around the knee area.

(Tr. 676).

On May 15, 2018, Dr. Jackson Liu, M.D., noted that Rodriguez reported sharp, stabbing, shooting, burning, and achy pain that has been ongoing for years in her "bilateral buttocks, posterior thigh, anterior thigh, anterior shin, knee, ankle, top of the foot, and bottom of the foot," which is alleviated by medications, heat, and resting, but exacerbated by walking, standing, sitting, bending, and lifting. (Tr. 695). These treatment notes stated that the pain is accompanied by numbness and weakness. (Id.)

On June 1, 2018, Rodriguez underwent a "[l]umbar interlaminar epidural steroid injection" with Dr. Liu. (Tr. 704). However, a physical examination with Dr. Torres in July of 2018 revealed back pain and myalgias. (Tr. 679). In August, Dr. Torres noted that Rodriguez was scheduled for another lumbar injection with Dr. Liu and that her pain was improved. (Tr. 685-86). On November 23, 2018, Dr. Torres recorded that Rodriguez "continues to have numbness in her legs." (Tr. 691). It was noted that the previous injections had provided relief but her symptoms were returning. (Id.) Rodriguez received another injection on December 18, 2018. (Tr. 710).

A January 21, 2019 CT examination showed a mild degree of multilevel facet disease, moderate diffuse disc bulging at L4-L5, and mild spinal canal stenosis. (Tr. 793). At a visit with Dr. Liu later in January, Dr. Liu noted that her lumbar range of motion was moderately limited, but she had a negative straight leg raise bilaterally. (Tr. 795). Dr. Liu did not think injections would help, and he noted that the pain could be related to fibromyalgia or underlying hip issues. (Tr. 796). On February 14, 2019, Rodriguez received injections in her left hip from Dr. Joel Horning, M.D. (Tr. 807). At a follow up with Dr. Liu, it was noted that the hip injection provided great relief, but she was having numbness in her left foot. (Tr. 808). By March 6, 2019, the numbness in her foot had resolved and she was not having pain in her hip. (Tr. 814). It was further noted that she was doing home exercises for her back. (Id.) In

May, Rodriguez requested another injection, as her hip pain had returned, but on review of her symptoms, Rodriguez was negative for back and neck pain. (Tr. 822-23). She received another injection on June 20, 2019. (Tr. 829).

On August 27, 2019, Dr. Torres completed a medical opinion in which he stated that Rodriguez could lift 20 pounds occasionally and less than ten pounds frequently; could stand or walk less than two hours in an 8-hour workday; and must periodically alternate sitting and standing to relieve pain or discomfort due to cervical and lumbar disc disease with radiculopathy, fibromyalgia, and chronic neck and back pain. (Tr. 720). Dr. Torres stated Rodriguez was limited in pushing and pulling in both the upper and lower extremities because her hand function is "limited by carpal tunnel syndrome," and an MRI of her cervical spine showed disc herniation and canal stenosis, while an MRI of her lumbar spine showed disc herniation. (Id.)

Dr. Torres stated that Rodriguez could never climb ladders, ropes, or scaffold and never balance or crawl, but that she could occasionally climb ramps or stairs and could occasionally stoop, kneel, and crouch. (Id.) Dr. Torres explained that she could not balance because her balance is impaired by back and neck pain, lumbar radiculopathy, and leg weakness. (Id.) Dr. Torres explained that she can only occasionally stoop, kneel, and crouch because she "[w]ill fatigue easily due to weakness, fibromyalgia. Pain in spine will be exacerbated." (Id.) Dr. Torres stated that Rodriguez is limited in reaching in all directions, handling, fingering, and

feeling "due to bilateral carpal tunnel syndrome causing hand pain, numbness, tingling, weakness. Additionally the cervical disc disease results in pain with use of the arms." (Tr. 722). Dr. Torres reported that Rodriguez should avoid concentrated exposures to extreme cold and heat, wetness, humidity, noise, vibration, fumes, odors, dusts, gasses, and poor ventilation and should avoid all exposure to hazards such as machinery and heights. (Tr. 723). Dr. Torres explained that "[h]er fibromyalgia is expected to be worsened by exposures to extremes of hot, cold, vibration. [] She cannot safely engage in potentially hazardous activities due to balance, sensory limitations from CTS, lumbar radiculopathy." (Id.)

The ALJ conducted a hearing in Rodriguez's case on April 16, 2019, and again on September 24, 2019 to supplement her work history report. (Tr. 160-222). At the hearings, Rodriguez testified that she can speak short phrases in English, but that she does not read or write English and prefers to use an interpreter at all times. (Tr. 164, 202-03). Rodriguez testified that she has many doctor appointments, that she lives alone in her house and sleeps on the second story, and that her laundry facilities are in her basement. (Tr. 200-01). Rodriguez testified that her daughter helps her pay her bills and that she received food stamps and $102 every other week as cash assistance from welfare, but that her house is "in arrears." (Tr. 201-02). She testified that she was injured by a woodcutting job (Tr. 199) and received worker's compensation. (Tr. 103, 218).

Rodriguez testified that she can drive a car, cook for herself, do her dishes, dust, take out the trash, sweep, mop, wash and dry (but not carry) laundry, grocery shop one to two times per week, and manage the payment of her bills. (Tr. 204-06). She testified that her daughter carries the laundry and cleans the bathroom for her because bending down causes a lot of pain, especially in her neck. (Tr. 205). She testified that her daughter, her neighbor, or her friend mows and shovels snow for her. (Tr. 205-06). Rodriguez testified that she can sit for up to an hour and then must stand for at least ten minutes before she can sit again. (Tr. 207). She testified that she can stand for an hour but, after standing that long, must sit for at least ten minutes. (Tr. 207-08). She testified that in her job filling and packing feather pillows, she lifted only light objects that weighed less than ten pounds. (Tr. 215).

Due to an issue with Rodriguez receiving the wrong forms, the ALJ adjourned the hearing, but a second hearing was held on September 24, 2019. The ALJ and the second vocational expert compared the job descriptions of jobs similar to Rodriguez's work history and asked Rodriguez which descriptions were closest to her work history. (Tr. 174-76). After Rodriguez identified the description most like her prior work, the ALJ determined, and the vocational expert confirmed, that Rodriguez has past work experience as a woodworking machine feeder, actually performed at a heavy exertional level; stuffer, customarily and actually performed at a light exertional level; hand packager, actually performed at a light exertional level;

and warehouse worker, actually performed at a medium exertional level. (Tr.173-77, 219-20).

The ALJ then posed several hypotheticals to the vocational expert. The first limited Rodriguez to a light work RFC, with occasional postural limitations. (Tr. 178-79). The vocational expert testified that a person with such limitations would have been able to do a combined job of Stuffer and Hand Packager as the ALJ determined Rodriguez had when stuffing and packaging pillows. (Tr. 179). The vocational expert testified that Rodriguez could not perform that hand packager job (such as packing chocolates) as customarily performed, but could perform the job as actually performed, because hand packager is generally performed at the medium exertional level but was actually performed at the light exertional level. (Tr. 179-80). The vocational expert also testified that Rodriguez could not perform the woodworking job nor the warehouse worker job. (Tr. 180).

The next hypothetical limited the claimant to the light exertional level, including limitations to standing or walking up to two hours in an eight-hour day and a sit stand option every 15 minutes. (Tr. 181-82).[2] The ALJ further limited the individual to never climbing ladders or crawl but occasionally climbing stairs,

[2] This hypothetical was based off of evidence that the ALJ had not considered at the time of the first hearing due to the records not being properly exhibited, and these records included an RFC assessment from Rodriguez's treating physician. (Tr. 180). Accordingly, the ALJ permitted the plaintiff's counsel to ask questions to the vocational expert based on those records. (Id.)

stooping, kneeling, and crouching; frequent reaching in all directions, including overhead; avoiding hazards, machineries, heights, and concentrated exposure to extreme cold, extreme heat, wetness, humidity, fumes, and odors. (Tr. 181-83). The vocational expert testified that such a person could not perform Rodriguez's past combined job as a Stuffer and Hand Packager but could perform the jobs of ticket taker, cashier II, and potato chip sorter. (Tr. 185).

The vocational expert further testified that, if all of the conditions of the previous hypothetical remained the same except that such a person could only *occasionally* reach, handle, finger, feel, and only occasionally environmental exposure, such a person could not do any of Rodriguez's past work nor the previously volunteered jobs but could perform the job of Baker Lever Conveyer Line. (Tr. 186). The vocational expert testified that there were no other jobs which a person such as that could perform at the light exertional level. (Tr. 186). Finally, the vocational expert testified that if the hypothetical person were off task more than 15% of the time due to pain or distractions, or if the hypothetical person missed more than two days per month, the person would not be employable. (Tr. 187).

Following the September 24, 2019, hearing, the ALJ issued a decision denying Rodriguez's application for benefits on January 30, 2020. (Tr. 121-29). In that decision, the ALJ first concluded that Rodriguez met the insured status requirements of the Social Security Act through December 31, 2019. (Tr. 123). At

Step 1, the ALJ determined that Rodriguez had not engaged in substantial gainful activity since September 21, 2017, the alleged onset date. (Tr. 123). At Step 2 of the sequential analysis that governs Social Security cases, the ALJ found Rodriguez had the following severe impairments: degenerative disc disease of the cervical and lumbar spine and obesity. (Tr. 123). The ALJ also found the following impairments to be nonsevere: hyperlipidemia, asthma, obstructive sleep apnea, Vitamin D deficiency, carpal tunnel syndrome, osteoarthritis of the left hip, anxiety, and depression. (Tr. 123-24). At Step 3, the ALJ determined that Rodriguez did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1. (Tr. 125).

Between Steps 3 and 4 the ALJ concluded that Rodriguez retained "the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) and she can occasionally crouch, crawl, kneel, stoop, balance, and climb ramps, stairs, ladders, ropes, or scaffolds." (Tr. 125). In reaching this RFC determination, the ALJ considered the medical evidence set forth above, the medical opinion evidence, and Rodriguez's statements regarding her limitations. With respect to the medical opinion evidence, The ALJ found the opinion of Dr. Legaspi persuasive. (Tr. 127). The ALJ reasoned that Dr. Legaspi's limitations were consistent with the treatment records which largely showed no distress, a normal

gait, normal range of motion, normal strength, no muscle atrophy, no cyanosis, and no edema. (Id.) The ALJ further stated that Dr. Legaspi's limitations were consistent with Rodriguez's activities of daily living, such as her ability to do housework, shop in stores, attend church, and make simple meals.

The ALJ found Dr. Torres' opinion unpersuasive. (Id.) The ALJ stated that Dr. Torres' more restrictive physical limitations were not supported by his own treatment notes, which largely showed normal physical examination findings despite Rodriguez's complaints of pain. (Id.) The ALJ also concluded that this opinion was inconsistent with Rodriguez's activities of daily living.

Finally, the ALJ considered the opinion of Dr. Parshall and found this opinion partially persuasive. (Tr. 127-28). The ALJ found Dr. Parshall's opinion of mild limitations in understanding, remembering, or applying information was supported by treatment notes, which indicated that Rodriguez had generally normal mental status examination findings. (Tr. 128). The ALJ further found, however, that the other limitations Dr. Parshall stated in her opinion were not consistent with Rodriguez's activities of daily living, including her ability to shop in stores, manage money, attend church, and make meals. (Id.)

The ALJ also considered Rodriguez's statements regarding her limitations but ultimately concluded that her statements were not entirely consistent with the medical evidence. (Tr. 126-27). Rodriguez stated that she could only walk for 15

minutes without a break; she could only stand for up to 15 minutes before she needed to sit down; and she does not finish what she starts and can only do things for 15 to 20 minutes at a time. (Tr. 126). The ALJ found that these statements and limitations were not consistent with the longitudinal treatment notes. (Id.) The ALJ noted Rodriguez's impairments of degenerative disc disease and obesity and recognized that she received treatment such as injections and medications. (Id.) Treatment notes from April of 2019 indicated that her pain was stable and she was feeling okay. (Id.) Further, the ALJ noted that Rodriguez lived alone and slept on the second floor of her home, and she was able to perform household chores and other activities of daily living. (Id.)

Thus, the ALJ found at Step 4 that Rodriguez could perform her past work as a hand packager. (Tr. 128). Having reached these conclusions, the ALJ determined that Rodriguez was not disabled since the alleged onset date and denied this claim. (Tr. 129).

This appeal followed. (Doc. 1). On appeal, Rodriguez challenges the adequacy of the ALJ's decision arguing that ALJ erred in his consideration—and articulation of his consideration—of the medical evidence when formulating Rodriguez's residual functional capacity.[3] (Doc. 15, at 1-2).

---

[3] Although we note that Rodriguez enumerates the issues differently in her brief, each issue is related to the ALJ's RFC determination and the ALJ's treatment of the medical evidence during the RFC determination. (See Doc. 15, at 1-2).

As discussed in greater detail below, having considered the arguments of counsel and carefully reviewed the record, we conclude that the ALJ's decision is supported by substantial evidence, and we will affirm the decision of the Commissioner.

## III. Discussion

### A. Substantial Evidence Review – the Role of this Court

When reviewing the Commissioner's final decision denying a claimant's application for benefits, this Court's review is limited to the question of whether the findings of the final decision-maker are supported by substantial evidence in the record. See 42 U.S.C. §405(g); Johnson v. Comm'r of Soc. Sec., 529 F.3d 198, 200 (3d Cir. 2008); Ficca v. Astrue, 901 F.Supp.2d 533, 536 (M.D. Pa. 2012). Substantial evidence "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Pierce v. Underwood, 487 U.S. 552, 565 (1988). Substantial evidence is less than a preponderance of the evidence but more than a mere scintilla. Richardson v. Perales, 402 U.S. 389, 401 (1971). A single piece of evidence is not substantial evidence if the ALJ ignores countervailing evidence or fails to resolve a conflict created by the evidence. Mason v. Shalala, 994 F.2d 1058, 1064 (3d Cir. 1993). But in an adequately developed factual record, substantial evidence may be "something less than the weight of the evidence, and the possibility of drawing two

inconsistent conclusions from the evidence does not prevent [the ALJ's decision] from being supported by substantial evidence." Consolo v. Fed. Maritime Comm'n, 383 U.S. 607, 620 (1966). "In determining if the Commissioner's decision is supported by substantial evidence the court must scrutinize the record as a whole." Leslie v. Barnhart, 304 F. Supp.2d 623, 627 (M.D. Pa. 2003).

The Supreme Court has underscored for us the limited scope of our review in this field, noting that:

> The phrase "substantial evidence" is a "term of art" used throughout administrative law to describe how courts are to review agency factfinding. T-Mobile South, LLC v. Roswell, 574 U.S. ——, ——, 135 S.Ct. 808, 815, 190 L.Ed.2d 679 (2015). Under the substantial-evidence standard, a court looks to an existing administrative record and asks whether it contains "sufficien[t] evidence" to support the agency's factual determinations. Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938) (emphasis deleted). And whatever the meaning of "substantial" in other contexts, the threshold for such evidentiary sufficiency is not high. Substantial evidence, this Court has said, is "more than a mere scintilla." Ibid.; see, e.g., Perales, 402 U.S. at 401, 91 S.Ct. 1420 (internal quotation marks omitted). It means—and means only—"such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Consolidated Edison, 305 U.S. at 229, 59 S.Ct. 206. See Dickinson v. Zurko, 527 U.S. 150, 153, 119 S.Ct. 1816, 144 L.Ed.2d 143 (1999) (comparing the substantial-evidence standard to the deferential clearly-erroneous standard).

Biestek v. Berryhill, 139 S. Ct. 1148, 1154 (2019).

The question before this Court, therefore, is not whether the claimant is disabled, but rather whether the Commissioner's finding that [she] is not disabled is supported by substantial evidence and was reached based upon a correct application

of the relevant law. See Arnold v. Colvin, No. 3:12-CV-02417, 2014 WL 940205, at *1 (M.D. Pa. Mar. 11, 2014) ("[I]t has been held that an ALJ's errors of law denote a lack of substantial evidence") (alterations omitted); Burton v. Schweiker, 512 F.Supp. 913, 914 (W.D. Pa. 1981) ("The Secretary's determination as to the status of a claim requires the correct application of the law to the facts"); see also Wright v. Sullivan, 900 F.2d 675, 678 (3d Cir. 1990) (noting that the scope of review on legal matters is plenary); Ficca, 901 F.Supp.2d at 536 ("[T]he court has plenary review of all legal issues . . . .").

Several fundamental legal propositions flow from this deferential standard of review. First, when conducting this review "we are mindful that we must not substitute our own judgment for that of the fact finder." Zirnsak v. Colvin, 777 F.3d 607, 611 (3d Cir. 2014) (citing Rutherford v. Barnhart, 399 F.3d 546, 552 (3d Cir. 2005)). Thus, we are enjoined to refrain from trying to re-weigh the evidence. Rather our task is to simply determine whether substantial evidence supported the ALJ's findings. However, we must also ascertain whether the ALJ's decision meets the burden of articulation demanded by the courts to enable informed judicial review. Simply put, "this Court requires the ALJ to set forth the reasons for his decision." Burnett v. Comm'r of Soc. Sec. Admin., 220 F.3d 112, 119 (3d Cir. 2000). As the Court of Appeals has noted on this score:

> In Burnett, we held that an ALJ must clearly set forth the reasons for his decision. 220 F.3d at 119. Conclusory statements . . . are

> insufficient. The ALJ must provide a "discussion of the evidence" and an "explanation of reasoning" for his conclusion sufficient to enable meaningful judicial review. Id. at 120; see Jones v. Barnhart, 364 F.3d 501, 505 & n. 3 (3d Cir.2004). The ALJ, of course, need not employ particular "magic" words: "Burnett does not require the ALJ to use particular language or adhere to a particular format in conducting his analysis." Jones, 364 F.3d at 505.

Diaz v. Comm'r of Soc. Sec., 577 F.3d 500, 504 (3d Cir. 2009).

Thus, in practice ours is a twofold task. We must evaluate the substance of the ALJ's decision under a deferential standard of review, but we must also give that decision careful scrutiny to ensure that the rationale for the ALJ's actions is sufficiently articulated to permit meaningful judicial review.

### B. Initial Burdens of Proof, Persuasion, and Articulation for the ALJ

To receive benefits under the Social Security Act by reason of disability, a claimant must demonstrate an inability to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A); 42 U.S.C. §1382c(a)(3)(A); see also 20 C.F.R. §§404.1505(a), 416.905(a). To satisfy this requirement, a claimant must have a severe physical or mental impairment that makes it impossible to do his or her previous work or any other substantial gainful activity that exists in the national economy. 42 U.S.C. §423(d)(2)(A); 42 U.S.C. §1382c(a)(3)(B); 20 C.F.R. §§404.1505(a), 416.905(a). To receive benefits under

Title II of the Social Security Act, a claimant must show that he or she contributed to the insurance program, is under retirement age, and became disabled prior to the date on which he or she was last insured. 42 U.S.C. §423(a); 20 C.F.R. §404.131(a).

In making this determination at the administrative level, the ALJ follows a five-step sequential evaluation process. 20 C.F.R. §§404.1520(a), 416.920(a). Under this process, the ALJ must sequentially determine: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals a listed impairment; (4) whether the claimant is able to do his or her past relevant work; and (5) whether the claimant is able to do any other work, considering his or her age, education, work experience and residual functional capacity ("RFC"). 20 C.F.R. §§404.1520(a)(4), 416.920(a)(4).

Between Steps 3 and 4, the ALJ must also assess a claimant's residual functional capacity (RFC). RFC is defined as "that which an individual is still able to do despite the limitations caused by his or her impairment(s)." Burnett, 220 F.3d at 121 (citations omitted); see also 20 C.F.R. §§404.1520(e), 404.1545(a)(1), 416.920(e), 416.945(a)(1). In making this assessment, the ALJ considers all of the claimant's medically determinable impairments, including any non-severe impairments identified by the ALJ at step two of his or her analysis. 20 C.F.R. §§404.1545(a)(2), 416.945(a)(2).

Once the ALJ has made this determination, our review of the ALJ's assessment of the plaintiff's RFC is deferential, and that RFC assessment will not be set aside if it is supported by substantial evidence. Burns v. Barnhart, 312 F.3d 113, 129 (3d Cir. 2002); see also Rathbun v. Berryhill, No. 3:17-CV-00301, 2018 WL 1514383, at *6 (M.D. Pa. Mar. 12, 2018), report and recommendation adopted, No. 3:17-CV-301, 2018 WL 1479366 (M.D. Pa. Mar. 27, 2018); Metzger v. Berryhill, No. 3:16-CV-1929, 2017 WL 1483328, at *5 (M.D. Pa. Mar. 29, 2017), report and recommendation adopted sub nom. Metzgar v. Colvin, No. 3:16-CV-1929, 2017 WL 1479426 (M.D. Pa. Apr. 21, 2017)..

At Steps 1 through 4, the claimant bears the initial burden of demonstrating the existence of a medically determinable impairment that prevents him or her in engaging in any of his or her past relevant work. Mason, 994 F.2d at 1064. Once this burden has been met by the claimant, it shifts to the Commissioner at Step 5 to show that jobs exist in significant number in the national economy that the claimant could perform that are consistent with the claimant's age, education, work experience and RFC. 20 C.F.R. §§404.1512(f), 416.912(f); Mason, 994 F.2d at 1064.

The ALJ's disability determination must meet certain basic substantive requisites. Most significant among these legal benchmarks is a requirement that the ALJ adequately explain the legal and factual basis for this disability determination. Thus, in order to facilitate review of the decision under the substantial evidence

standard, the ALJ's decision must be accompanied by "a clear and satisfactory explication of the basis on which it rests." Cotter v. Harris, 642 F.2d 700, 704 (3d Cir. 1981). Conflicts in the evidence must be resolved and the ALJ must indicate which evidence was accepted, which evidence was rejected, and the reasons for rejecting certain evidence. Id. at 706-707. In addition, "[t]he ALJ must indicate in his decision which evidence he has rejected and which he is relying on as the basis for his finding." Schaudeck v. Comm'r of Soc. Sec., 181 F. 3d 429, 433 (3d Cir. 1999).

**C. Legal Benchmarks for the ALJ's Assessment of Medical Opinions**

The plaintiff filed this disability application in November of 2017, shortly after a paradigm shift in the manner in which medical opinions were evaluated when assessing Social Security claims. Prior to March 2017, ALJs were required to follow regulations which defined medical opinions narrowly and created a hierarchy of medical source opinions with treating sources at the apex of this hierarchy. However, in March of 2017, the Commissioner's regulations governing medical opinions changed in a number of fundamental ways. The range of opinions that ALJs were enjoined to consider were broadened substantially, and the approach to evaluating opinions was changed from a hierarchical form of review to a more holistic analysis. As one court as aptly observed:

> The regulations regarding the evaluation of medical evidence have been amended for claims filed after March 27, 2017, and several of the prior

Social Security Rulings, including SSR 96-2p, have been rescinded. According to the new regulations, the Commissioner "will no longer give any specific evidentiary weight to medical opinions; this includes giving controlling weight to any medical opinion." Revisions to Rules Regarding the Evaluation of Medical Evidence ("Revisions to Rules"), 2017 WL 168819, 82 Fed. Reg. 5844, at 5867–68 (Jan. 18, 2017), see 20 C.F.R. §§ 404.1520c(a), 416.920c(a). Instead, the Commissioner must consider all medical opinions and "evaluate their persuasiveness" based on the following five factors: supportability; consistency; relationship with the claimant; specialization; and "other factors." 20 C.F.R. §§ 404.1520c(a)-(c), 416.920c(a)-(c).

Although the new regulations eliminate the perceived hierarchy of medical sources, deference to specific medical opinions, and assigning "weight" to a medical opinion, the ALJ must still "articulate how [he or she] considered the medical opinions" and "how persuasive [he or she] find[s] all of the medical opinions." Id. at §§ 404.1520c(a) and (b)(1), 416.920c(a) and (b)(1). The two "most important factors for determining the persuasiveness of medical opinions are consistency and supportability," which are the "same factors" that formed the foundation of the treating source rule. Revisions to Rules, 82 Fed. Reg. 5844-01 at 5853.

An ALJ is specifically required to "explain how [he or she] considered the supportability and consistency factors" for a medical opinion. 20 C.F.R. §§ 404.1520c (b)(2), 416.920c(b)(2). With respect to "supportability," the new regulations provide that "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be." Id. at §§ 404.1520c(c)(1), 416.920c(c)(1). The regulations provide that with respect to "consistency," "[t]he more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be." Id. at §§ 404.1520c(c)(2), 416.920c(c)(2).

Under the new regulations an ALJ must consider, but need not explicitly discuss, the three remaining factors in determining the

> persuasiveness of a medical source's opinion. Id. at §§ 404.1520c(b)(2), 416.920c(b)(2). However, where the ALJ has found two or more medical opinions to be equally well supported and consistent with the record, but not exactly the same, the ALJ must articulate how he or she considered those factors contained in paragraphs (c)(3) through (c)(5). Id. at §§ 404.1520c(b)(3), 416.920c(b)(3).

Andrew G. v. Comm'r of Soc. Sec., No. 3:19-CV-0942 (ML), 2020 WL 5848776, at *5 (N.D.N.Y. Oct. 1, 2020).

Oftentimes, as in this case, an ALJ must evaluate various medical opinions. Judicial review of this aspect of ALJ decision-making is still guided by several settled legal tenets. First, when presented with a disputed factual record, it is well-established that "[t]he ALJ – not treating or examining physicians or State agency consultants – must make the ultimate disability and RFC determinations." Chandler v. Comm'r of Soc. Sec., 667 F.3d 356, 361 (3d Cir. 2011). Thus, when evaluating medical opinions "the ALJ may choose whom to credit but 'cannot reject evidence for no reason or for the wrong reason.'" Morales v. Apfel, 225 F.3d 310, 317 (3d Cir. 2000) (quoting Mason, 994 F.2d at 1066). Therefore, provided that the decision is accompanied by an adequate, articulated rationale, it is the province and the duty of the ALJ to choose which medical opinions and evidence deserve greater weight.

Further, in making this assessment of medical evidence:

> An ALJ is [also] entitled generally to credit parts of an opinion without crediting the entire opinion. See Thackara v. Colvin, No. 1:14–CV–00158–GBC, 2015 WL 1295956, at *5 (M.D. Pa. Mar. 23, 2015); Turner v. Colvin, 964 F. Supp. 2d 21, 29 (D.D.C. 2013) (agreeing that "SSR 96–2p does not prohibit the ALJ from crediting some parts of a

> treating source's opinion and rejecting other portions"); Connors v. Astrue, No. 10–CV–197–PB, 2011 WL 2359055, at *9 (D.N.H. June 10, 2011). It follows that an ALJ can give partial credit to all medical opinions and can formulate an RFC based on different parts from the different medical opinions. See e.g., Thackara v. Colvin, No. 1:14–CV–00158–GBC, 2015 WL 1295956, at *5 (M.D. Pa. Mar. 23, 2015).

Durden v. Colvin, 191 F.Supp.3d 429, 455 (M.D. Pa. 2016). Finally, where there is no evidence of any credible medical opinion supporting a claimant's allegations of disability "the proposition that an ALJ must always base his RFC on a medical opinion from a physician is misguided." Cummings, 129 F.Supp.3d at 214–15.

**D. The ALJ's Decision in This Case is Supported by Substantial Evidence.**

In this setting, we are mindful that we are not free to substitute our independent assessment of the evidence for the ALJ's determinations. Rather, we must simply ascertain whether the ALJ's decision is supported by substantial evidence, a quantum of proof which is less than a preponderance of the evidence but more than a mere scintilla, Richardson v. Perales, 402 U.S. 389, 401 (1971), and "does not mean a large or considerable amount of evidence," Pierce v. Underwood, 487 U.S. 552, 565 (1988), but rather "means—and means only—'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' " Biestek, 139 S. Ct. at 1154. Judged against these deferential standards of review,

while we regard this as a close case, we find that substantial evidence supported the ALJ's decision that Rodriguez was not entirely disabled.

**1. Step Two Analysis**

At the outset, it appears that Rodriguez takes issue with the fact that the ALJ found several conditions to be nonsevere impairments at Step 2 of the sequential analysis. At Step 2 of the sequential analysis, the ALJ determines whether a claimant has a medically severe impairment or combination of impairments. Bowen v. Yuckert, 482 U.S. 137, 140-41, 107 S.Ct. 2287, 96 L.Ed.2d 119 (1987). An impairment is considered severe if it "significantly limits an individual's physical or mental abilities to do basic work activities. 20 C.F.R. 404.1520(c). An impairment is severe if it is "something beyond 'a slight abnormality which would have no more than a minimal effect on an individual's ability to work.'" McCrea v. Comm'r of Soc. Sec., 370 F.3d 357, 360 (3d Cir. 2004) (quoting SSR 85-28, 1985 WL 56856 (1985)). The Court of Appeals is clear that the Step 2 inquiry is a *de minimis* screening device used to cast out meritless claims. McCrea, 370 F.3d at 360; Newell v. Comm'r of Soc. Sec., 347 F.3d 541, 546 (3d Cir. 2003). The burden is on the claimant to show that an impairment qualifies as severe. Bowen, 482 U.S. at 146, 107 S.Ct. 2287. Stancavage v. Saul, 469 F.Supp.3d 311, 331 (M.D. Pa. 2020). On this score, "[f]ailing to find an impairment to be severe may be harmless when the ALJ does not deny benefits at that step and properly considered the condition in

the remaining analysis." Edinger v. Saul, 432 F.Supp.3d 516, 531 (E.D. Pa. 2020). Indeed, "the analysis at step two is wholly independent of the analysis at later steps," and "not finding certain impairments severe at step two does not affect the ultimate disability determination." Alvarado v. Colvin, 147 F.Supp.3d 297, 311 (E.D. Pa. 2015).

In the instant case, the ALJ found Rodriguez's depression, anxiety, left hip osteoarthritis, and carpal tunnel syndrome to be nonsevere impairments. The ALJ explained that the evidence indicated Rodriguez's carpal tunnel syndrome was treated with injections, and that her left hip osteoarthritis was also treated with injections, and by March of 2019, it was noted that Rodriguez "continues to have really no pain in her hip." (Tr. 124). Regarding her depression and anxiety, the ALJ considered the areas of mental functioning and ultimately found that Rodriguez had a mild limitation in understanding, remembering, and applying information, but she had no limitations in interacting with others, managing oneself, or concentrating, persisting, or maintaining pace. (Id.) The ALJ noted that Rodriguez's treatment notes showed largely normal mental status evaluation findings, and that Rodriguez was improving since she was taking her medications consistently. (Id.) The ALJ further stated that a consideration of the plaintiff's activities of daily living, including doing housework, spending time with family and friends, and attending church, supported the finding that the plaintiff was not limited in these areas of

mental functioning. (Id.) Finally, with respect to her fibromyalgia, the ALJ found that the record failed to show 11 out of 18 tender points or treatment by a rheumatologist. (Tr. 125). The ALJ further noted that she considered SSR 12-2p and found that the requirements had not been met. (Id.)

On this score, we cannot conclude that these Step 2 findings warrant a remand. As we have noted, "not finding certain impairments severe at step two does not affect the ultimate disability determination." Alvarado, 147 F.Supp.3d at 311. Here, the ALJ considered these impairments, discussed the treatment notes related to these impairments, and found that they had no more than a minimal limitation on Rodriguez's ability to do basic work activities. The ALJ then discussed the treatment notes in the remainder of the decision, including the medical opinion evidence, and ultimately found that Rodriguez could perform light work with occasional postural limitations. Given that substantial evidence "means—and means only—'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' " Biestek, 139 S. Ct. at 1154, we conclude that substantial evidence supports the ALJ's Step 2 analysis.

**2. RFC Assessment**

Rodriguez next asserts that the ALJ failed to consider limitations from both her severe and nonsevere impairments in crafting the RFC of light work with occasional postural limitations. She further contends that the ALJ should have given

greater weight to the statement of Dr. Torres, her treating physician, in determining her RFC.

First, with respect to the medical opinion evidence, the ALJ was not required to give Dr. Torres' opinion more weight than the other state agency consultants. Rather, we find that this opinion, and the competing view of Dr. Legaspi were appropriately weighed by the ALJ under the current prevailing paradigm for analysis of medical opinions, which requires the ALJ to identify the persuasiveness of these opinions, and explicitly address their supportability and consistency. Here, as the ALJ explained, the views expressed by Dr. Legaspi with respect to Rodriguez's physical limitations was supported by the treatment records for Rodriguez. Further, this opinion was congruent with Rodriguez's self-reported activities of daily living. With respect to her mental impairments, while found to be nonsevere, the ALJ considered the opinion of Dr. Parshall, described it has partially consistent with the claimant's treatment notes, and ultimately found the opinion to be partially persuasive. Therefore, substantial evidence supported the ALJ's findings that these opinions had greater persuasiveness than the more extreme and limited view expressed by Dr. Torres. Under the current prevailing standards governing assessment of medical experts, there was no error here.

Moreover, the ALJ considered all of the treatment notes with respect to the severe and nonsevere impairments in assessing Rodriguez's residual functional

capacity. The ALJ ultimately concluded that the longitudinal treatment notes did not support Rodriguez's own allegations regarding her limitations. Rather, while the ALJ noted her degenerative disc disease and obesity, the treatment notes showed largely normal examination findings, and by March of 2019, that Rodriguez's pain was stable. With respect to her depression and anxiety, these impairments had also improved by March of 2019 because Rodriguez was consistently taking her medication. Rodriguez's activities of daily living indicated that she was not as physically limited as she alleged, in that she lived alone and slept on the second story of her home; she performed light household chores such as cleaning and cooking; she attended church and spent time with her family; and she was able to shop in stores and manage her own money.

At bottom, it appears that the plaintiff is requesting that this court re-weigh the medical and opinion evidence. This we may not do. See Chandler v. Comm'r of Soc. Sec., 667 F.3d 356, 359 (3d Cir. 2011) (citing Richardson v. Perales, 402 U.S. 389, 401 (1971) ("Courts are not permitted to re-weigh the evidence or impose their own factual determinations."); see also Gonzalez v. Astrue, 537 F.Supp.2d 644, 657 (D. Del. 2008) ("In determining whether substantial evidence supports the Commissioner's findings, the Court may not undertake a *de novo* review of the Commissioner's decision and may not re-weigh the evidence of the record.") (internal citations omitted)). Rather, our task is simply to determine whether the

ALJ's decision is supported by substantial evidence, a quantum of proof which is less than a preponderance of the evidence but more than a mere scintilla, Richardson, 402 U.S. at 401, and "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Pierce, 487 U.S. at 565. Finding that this deferential standard of review is met here, we conclude that a remand is not appropriate for the purpose of further assessing this opinion evidence.

Furthermore, the plaintiff argues that she should be considered disabled under the Medical Vocational Grid Rule 202.09 or 201.12 because she is a Spanish-speaking individual closely approaching advanced age. (Doc. 15, at 16). However, Grid Rule 202.09 requires a finding of disabled for a person limited to light work who is no longer able to perform vocationally relevant past work. See 20 C.F.R. Pt. 404, Subpt. 2, App. 2, 202.00(c). Here, the ALJ found at Step 4 that Rodriguez could perform her past work. Moreover, to the extent Rodriguez argues she should have been limited to sedentary work and, thus, would be found disabled under Grid Rule 201.12, we have found that substantial evidence supports the ALJ's light work RFC determination. Accordingly, this Grid Rule is inapplicable.

**3. New Evidence Remand**

Finally, Rodriguez presented new evidence to the Appeals Council, and the Appeals Council found that this evidence would not likely have changed the

Commissioner's determination. (Tr. 2). This evidence included records from July 2019 to February 2020.

The legal standards that must be met to warrant a remand based upon newly discovered evidence are exacting ones. As we have noted in this setting:

> 42 U.S.C. § 405(g) provides that: "The court may ... at any time order additional evidence to be taken before the Commissioner of Social Security, but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding." In exercising this authority, the United States Court of Appeals for the Third Circuit has emphasized that a claimant seeking remand on the basis of new evidence must demonstrate that the additional evidence is both new and material, and that the claimant had good cause for not submitting the evidence to the ALJ for his initial review. Szubak v. Sec'y of Health and Human Servs., 745 F.2d 831, 833 (3d Cir. 1984). Where such criteria are met, the district court may enter what is colloquially referred to as a "sentence six" remand pursuant to the sixth sentence of 42 U.S.C. § 405(g).
>
> In order for a claimant to prevail on a request for a sentence six remand, the evidence to be considered must first truly be "new evidence" and "not merely cumulative of what is already in the record." Szubak, 745 F.2d at 833. Second, the evidence must be "material," meaning that it must be "relevant and probative." Id. In making this determination,
>
>> the materiality standard of § 405(g) requires "that there be a reasonable possibility that the new evidence would have changed the outcome of the Secretary's determination." Id. See also Booz v. Secretary of Health and Human Services, 734 F.2d 1378, 1381 (9th Cir. 1984); Dorsey v. Heckler, 702 F.2d 597, 604–05 (5th Cir. 1983); Chaney v. Schweiker, 659 F.2d 676, 679 (5th Cir. 1981). Thus, to secure remand, a claimant must show that new evidence raises a "reasonable possibility" of

> reversal sufficient to undermine confidence in the prior decision. The burden of such a showing is not great. A "reasonable possibility," while requiring more than a minimal showing, need not meet a preponderance test. Instead, it is adequate if the new evidence is material and there is a reasonable possibility that it is sufficient to warrant a different outcome.

Newhouse v. Heckler, 753 F.2d 283, 287 (3d Cir. 1985). Further, "[a]n implicit materiality requirement is that the new evidence relate to the time period for which benefits were denied...." Szubak, 745 F.2d at 833 (citing Ward v. Schweiker, 686 F.2d 762, 765 (9th Cir. 1982)).

In practice,

> [f]our factors must be considered pursuant to this requirement. See, e.g., Newhouse v. Heckler, 753 F.2d 283, 287 (3d Cir. 1985). First, the evidence must be new and not merely cumulative of what is already in the record. Id. at 287. Second, the evidence must be material, relevant and probative. Id. Third, there must exist a reasonable probability that the new evidence would have caused the Commissioner to reach a different conclusion. Id. Fourth, the claimant must show good cause as to why the evidence was not incorporated into the earlier administrative record. Id.

Scatorchia v. Comm'r of Soc. Sec., 137 F. App'x 468, 472 (3d Cir. 2005).

Passaretti v. Berryhill, No. 4:17-CV-1674, 2018 WL 3361058, at *10–11 (M.D. Pa. July 10, 2018).

As we have noted, following the ALJ's hearing and decision in this case, Rodriguez submitted additional medical records to the Appeals Council for its consideration. (Tr. 9-58, 69-114). The Appeals Council found that the newly

submitted evidence would not have likely changed the decision of the Commissioner. We agree. Treatment notes from Lancaster General indicate in July 2019 that Rodriguez's fibromyalgia symptoms were stable, and that she had minimal depression symptoms. (Tr. 80). While she was experiencing new back and neck pain, as well as numbness in October 2019, progress notes from a November visit indicate that Rodriguez was feeling "pretty good," and that her symptoms had resolved. (Tr. 100-01). It was also noted that she was continuing to receive injections for her left hip pain. (Tr. 102).

Thus, these records, in our view, did not differ materially from the treatment records which the ALJ had previously received. These records, like the records provided to the ALJ, disclosed that Rodriguez continued to treat for her fibromyalgia symptoms and depression, but that her symptoms had remained mostly stable throughout this time. Thus, these after-acquired records did not appear to materially alter the medical profile in this case. Therefore, this evidence does not meet the criteria for a new evidence remand for at least three reasons. First, this evidence was not in any meaningful sense "new" but is merely cumulative of what is already in the record. Second, given the similarity between these treatment notes that the medical records that were before the ALJ this evidence was not material, relevant and probative. Finally, this largely cumulative evidence simply did not create a reasonable probability that the new evidence would have caused the Commissioner

to reach a different conclusion. See Scatorchia v. Comm'r of Soc. Sec., 137 F. App'x 468, 472 (3d Cir. 2005). For these reasons, Rodriguez's new evidence remand argument also fails.

In sum, on its merits the ALJ's assessment of the evidence in this case complied with the dictates of the law and was supported by substantial evidence. This is all that the law requires, and all that a claimant can demand in a disability proceeding. Thus, notwithstanding the argument that this evidence might have been viewed in a way which would have also supported a different finding, we are obliged to affirm this ruling once we find that it is "supported by substantial evidence, 'even [where] this court acting *de novo* might have reached a different conclusion.' " Monsour Med. Ctr. v. Heckler, 806 F.2d 1185, 1190–91 (3d Cir. 1986) (quoting Hunter Douglas, Inc. v. NLRB, 804 F.2d 808, 812 (3d Cir. 1986)). Accordingly, under the deferential standard of review that applies to appeals of Social Security disability determinations, we find that substantial evidence supported the ALJ's evaluation of this case and we will affirm the Commissioner's final decision.

An appropriate order follows.

/s/ *Martin C. Carlson*
Martin C. Carlson
United States Magistrate Judge